### DOWLING v. TEXAS & N. O. R. CO.
### No. 10068.

Court of Civil Appeals of Texas. Galveston.
Feb. 8, 1935.

Rehearing Denied Feb. 28, 1935.

Charles Murphy, of Houston, for appellant.

John P. Bullington and Baker, Botts, Andrews & Wharton, all of Houston, for appellee.

GRAVES, Justice.

The appellant as an employee of the appellee (one of the railroads composing the Southern Pacific Lines), who had been retired under its rules after reaching the age of 70 years, sought in this action to compel the railroad company to pay him a pension as one who had been continuously employed by it for more than 20 years within the meaning of the rules and regulations governing the "Pension System" the Southern Pacific Lines had had in effect since 1903 for the benefit of the officers and employees of any one of the railroads included in such "Lines." After answer by the railroad company to the effect that appellant was ineligible and not entitled to such pension because of a break in his service resulting from his having resigned and quit of his own accord in 1913, which ineligibility had been passed upon and declared by all the authorities established for that purpose under the "Pension System" itself, the learned trial court, together with a jury, heard the evidence, which consisted of the testimony of the appellant, his written application for a pension, his like application for re-employment in 1914, the rules and regulations or contract of the "Pension System," and an agreed statement of facts by counsel for both sides. The court instructed the jury to return a verdict in the appellee's favor, following, upon a due return thereof, with a decree that appellant take nothing.

The evidence thus received consisted mainly of undisputed facts, which are thus summarized in the brief of the appellee:

"The employees put up no money for the Pension Fund, nor is any deduction made

from their wages on that account. Under Section 9 of the regulations it is provided that the pension allowances will be paid by the railroad and charged to operating expenses. Section 3 of the Plan provides that 'the benefits of the Pension System will apply only to those persons who have been continuously employed by the companies named in Rule 6 under the conditions therein described * * *' and in Section 6 it is provided that '* * * the service of any employee of any of said companies shall be continuous from the date from which he has been continuously employed by said companies or any of them.' Section 7 provides that 'in computing service, it shall be reckoned from the date since which the person has been continuously in the service to the date when retired, eliminating in the final result any fractional part of a month.' This same section also provides that: 'Leave of absence when unattended by other employment, suspension, dismissal followed by reinstatement within one year, or temporary lay-off on account of reduction of force, is not to be considered as a break in the continuity of service. * * * Persons who leave the service thereby relinquish all claims to the benefits of pension allowances.' Article 17 provides that 'neither the action of the Board of Directors in establishing a system of pension, nor any other action now or hereafter taken by them or by the Board of Pensions in the inauguration and operation of a Pension Department, shall be construed as giving to any officer, agent or employee a right to be retained in the service, or any right or claim to any pension allowance. * * *'

"By the provisions of Sections 1 and 2 the administration of the Pension Department is placed in the hands of a 'Board of Pensions,' composed of certain named officers and employees of the various companies. In Section 2 it is provided that 'the action of the Board of Pensions, when approved by the President, shall be final and conclusive.'

"This last-quoted provision was changed by a resolution duly adopted on October 7, 1927, so that the word 'President' was changed to 'Executive Vice-President.'

"The appellant was employed by the T. & N. O. Railroad in 1895, before any Pension Plan had ever been adopted, and remained in the service of the company as a stationary engineer until August, 1913. He testified: 'I left the service of the Texas & New Orleans Company at that time. I quit the service. * * * Powers told me he wanted me to go down and fire and run it myself, and I told him I couldn't do it, and he said all right, he had

men that could do it. He wanted me to act as stationary engineer and fireman both. Then I left the service of the company at that time. I went to work there that night, I thought I would, but when I went to work they told me I didn't have any fireman, and so I quit.' He further testified that: 'When I quit, I quit of my own accord. * * * I did work as an engineer before I went back to work for the company.'

"In the year 1914 he came back into the service, through the efforts of Mr. Power, Superintendent of Motive Power.

"He made written application to return to the service, and in reply to question No. 7 therein, with regard to any previous employment with the company and the cause of leaving, he answered: 'Stationary engineer—resigned—own accord.' Likewise, in his application for pension he was required to show absences, which had occurred during his entire employment with the Southern Pacific Lines, and in the space provided for that purpose he showed that he had left the service on August 25, 1913, and had returned April 1, 1914; that his reason for leaving was that he 'resigned,' and that during the interval he was employed by the National Creosote Company as an engineer on a switch engine."

There may be added the circumstances attending and under which appellant was re-employed in 1914, as thus testified to by him:

"I remained out of the service from the time I left there until about March, 1914. I think it was in March, 1914, and Mr. Powers hired me again. When I went back to work there they had a fireman working and an engineer both, and I took that engineer's place. They put him on another job. I went back to the same place to work and discharged the same duty, the same place that I had left the year before. They had it just like it was when I left there, with the fireman working, and I went back to the old job. I worked there as engineer until 1930. When I went back to work there I went back to work at nights, and worked at nights altogether until 1930. When I was let out in 1930 they gave as the reason that I was up to the age limit. I was seventy years old, the age limit, and couldn't work no longer for the company.

"When I went back in 1914 and Powers hired me again, he was the shop-superintendent, and at that time a question came up about my age. He told me he couldn't hire me on account of my age, and he said 'I will have to re-instate you, you are over the age limit,' and he re-instated me. I mean that at the time he hired me in 1914 I was over the

age limit and he couldn't hire me without re-instating me. He talked to George McCormick, and McCormick said it was all right to re-instate me. I think McCormick was on the pension board at that time. * * * Powers told me at the time I was re-instated, and I worked there from the time I went to work in 1914 down to 1930, when I was permanently relieved.

"While I was working for the company I knew they had a pension system, but I never had a copy of the rules and regulations with reference to the pension.

"I didn't know anything about the pension system, except I knew they did have one."

The correctness may be conceded of appellant's contention that the rules and regulations of the "Pension System," the principal ones of which have been quoted, supra, constitute a part of the contract of employment between the parties, but in consequence it further follows that as such its provisions were mutually binding upon them both, at least in the absence of accident, fraud, or mistake, no one of which undermining causes was either alleged or claimed in this instance; accordingly, when the plan thereof is even casually looked to, it is unmistakable that its keystone was continuity of service on the part of the employee for at least 20 years; that being the sine qua non of its extension to any employee in any instance, except in one of these three expressly and specifically stated contingencies:

"(1) Where there has been a leave of absence when unattended by other employment.

"(2) Suspension or dismissal followed by reinstatement within one year,

"(3) Temporary lay-off on account of reduction of force."

It seems plain under the undisputed facts, including his own testimony, that appellant's case was not brought within any one of these stated exceptions. Through able counsel, however, he nevertheless earnestly contends here that he should in law be regarded as having come within the second one, on the ground that his leaving the service in August of 1913 and being re-employed on April 1st of 1914 amounted to a discharge or suspension, followed by reinstatement within one year. The argument is that he was really forced by the railroad company to retire at that time, and that, since he was re-employed within less than a year and given his old place, when in fact he was then beyond the age at which the company under its rules

could employ men, his being so taken back should be regarded as in effect a mere reinstatement. But his own testimony repels any such inference as plainly as language could make it; he affirmatively time and again saying he was not discharged nor in any way forced to retire, but that he did so of his own free will and accord. For instance, to in part repeat what has been quoted from him, he summed up just what he did and the reason for it in these two statements: "In August, 1913, Mr. Power wanted me to go on at night, take a job as engineer at night, and I told him I couldn't hold the job down by myself, and he said that he had men that could, and so I quit. I couldn't do it and I wouldn't try it. * * * When I quit, I quit of my own accord."

Not only so, but, as he stated at another place in his quoted testimony, he did not quit at the time of this conversation with Mr. Power but went back to work that night expecting to continue in the service. When he found there was no fireman there to aid him, he then quit, as he freely states, of his own accord and without giving the railroad company any notice or opportunity to supply his place; his leaving the employ of the company thus being the result of a difference of opinion on his part with his superior in the service, there being no attempt on his part to show which was right, or whether or not he had been imposed upon, just his voluntary retirement because he could not do the work required of him that way and would not even try.

In these undisputed circumstances it seems clear that the trial court was right in presumably holding that the indispensable requirement of continuous service for a period of 20 years was not met, hence appellant did not show himself to be eligible to participation in the pension fund.

■ The judgment is properly sustainable upon another ground, which is this: This "Pension System" having been one of the pioneers in that field, the total costs of which were borne by the employer as a part of its operating expense, with no deduction from the pay of nor contribution by any of its employees on account thereof, the railroad company had the right to provide for its administration by a board of pensions, whose decisions, when approved by the company's executive vice president, should be final and conclusive; such provision being binding upon all its employees and not subject to attack in the courts, except upon a showing of fraud or bad faith, which was neither alleged nor claimed in this instance. In support of this

last conclusion these authorities are cited: Clark v. New England Telephone & Telegraph Co. (1917) 229 Mass. 1, 118 N. E. 348, 350; Western Union Telegraph Co. v. Robertson (1920) 146 Ark. 406, 225 S. W. 649; Spiner v. Western Union Tel. Co. (Beaumont Court of Civil Appeals 1934) 73 S.W.(2d) 566, writ of error denied; Cousins v. Pullman Co. (Dallas Court of Civil Appeals 1934) 72 S.W.(2d) 356.

Under the stipulation attached to the statement of facts, referred to, supra, it appears that appellant's application for pension was duly submitted to the board of pensions of the appellee, was finally denied by that board on August 19, 1932, which action of the board of pensions was approved by the executive vice president of the Southern Pacific Lines.

Under amended section 2 of the pension system, it is provided that "the actions of the Board of Pensions, when approved by the Executive Vice President, shall be final and conclusive."

Wherefore, the principles announced in the cited Clark Case from Massachusetts, which this court regards as sound, are directly applicable; the material facts there not being in legal purport different from those obtaining here. In that instance also an employees' benefit fund established by the employer, to which the employees made no contributions, was involved. It was provided that the benefit fund should be administered by a committee, and that "questions of fact arising in the administration of these regulations shall be determined conclusively for all parties by the committee," about the only difference between that wording and that in the instant case being that a board of pensions is the administering agent here, and the finality of its decisions is not limited to mere questions of fact. In holding that Clark had no cause of action, the court said: "The committee is made the quasi-arbitrator as to all claims against the fund. * * * Moreover, this was a fund supplied and kept up entirely by the defendant and administered at its own expense. The employees made no contribution to it. * * * While the relation of the defendant to its employees in this respect is contractual, it is one of a peculiar nature. The defendant makes all the contributions to the funds by voluntary action and distributes it according to a stipulated plan mutually accepted by it and the employees in way of beneficial relief to the latter. So far as that plan is executed in good faith, no sound reason appears why its terms should not govern the rights of the parties."

These conclusions require an affirmance of the trial court's judgment; it will be so ordered.

Affirmed.