Lola B. LONG, Appellant,

v.

**SOUTHWESTERN BELL TELEPHONE COMPANY, Appellee.**

No. 14719.

Court of Civil Appeals of Texas.

San Antonio.

May 21, 1969.

Rehearing Denied June 18, 1969.

of the deceased employee, if living with him at the time of his death." It is administered by an "Employees' Benefit Committee," which we shall designate as the "General Committee," consisting entirely of top echelon officials of defendant, appointed by defendant's board of directors. The plan provides that the General Committee "shall determine conclusively for all parties all questions arising in the administration of the Plan." The General Committee meets in St. Louis, Missouri, where defendant's principal office is located.

Defendant's business activities embrace several states which are divided into operating areas. Although the plan itself makes no provision for such procedure, the General Committee has appointed, for each operating area, an Employees' Benefit Committee (herein referred to as the "Area Committee") to investigate claims arising under the plan. As far as claims for death benefits are concerned, the Area Committee, which consists of management officials within the area, makes no decisions but merely makes recommendations to the General Committee, which is the only body empowered to make decisions relating to such claims.

The General Committee, acting upon the recommendation of the Area Committee, decided that plaintiff was not entitled to death benefits under the plan because she was not living with her husband at the time of his death.

Only two issues were submitted to the jury. In answer to the first, the jury found that plaintiff was living with Mr. Long at the time of his death. The second issue inquired whether the action of the "Defendant's Employees' Benefit Committee," in denying death benefits to plaintiff, "constituted fraud." An accompanying explanatory instruction told the jury that "fraud is any act, omission or concealment which involves a breach of legal duty, trust or confidence, justly reposed, and is injurious to another, or by which an undue and unconscientious advantage is taken of an-

Frank C. Rodgers, Richard G. Strong, San Antonio, for appellant.

James E. Barden, Houston, Leo E. Eickhoff, Jr., Hubert W. Green, Jr., San Antonio, for appellee.

CADENA, Justice.

Plaintiff, Lola B. Long, surviving widow of Hansel Andy Long, deceased employee of defendant, Southwestern Bell Telephone Company, appeals from rendition of judgment non obstante veredicto denying her recovery of death benefits under defendant's "Plan for Employees' Pensions, Disability Benefits and Death Benefits," herein designated as the "plan."

Among other things, the plan calls for the payment of death benefits "to the wife

other." After the jury's request for a clearer definition of "fraud" and a clarification of the phrase, "justly reposed," had been answered with the usual admonition that the jury was to be governed by the charge, "as written," the jury reported that they were unable to agree on an answer to the second issue "as worded."

The trial court received the partial verdict and granted defendant's motion for judgment non obstante veredicto.

For the purpose of this opinion, we accept plaintiff's contention that, although all contributions to the fund from which benefits were paid were made by defendant, defendant's plan is not a mere gratuity bestowed by a generous employer, but that it must be regarded as a mode of employee compensation, creating contractual rights in the employees and imposing contractual obligations on the employer.[1] But even if the plan is regarded as a contract between defendant and its employees, defendant's obligation to pay death benefits is subject to the express conditions and limitations embodied in the plan, i.e., the contract. Where the plan vests discretion in a board, committee or management to determine eligibility to receive benefits provided for in the plan, it is necessary that the eligibility-determining body shall have found that the claimant has complied with the provisions and conditions of the plan and is eligible to receive the benefits. The provision vesting conclusive adjudicative discretion in the General Committee is binding upon all claimants and is not subject to attack in the courts in the absence of a showing of fraud or bad faith. Aston v. Magnolia Petroleum Co., 241 S.W.2d 306 (Tex.Civ.App.—Fort Worth 1951, writ ref'd); Dowling v. Texas & N. O. R. Co., 80 S.W.2d 456 (Tex.Civ.App.—Galveston 1935, writ ref'd); Spiner v. Western Un-

ion Telegraph Co., 73 S.W.2d 566 (Tex. Civ.App.—Beaumont 1934, writ ref'd); Anno.: 42 A.L.R.2d 461, 472–475 (1955).

In this case, plaintiff's pleading of fraud and bad faith consisted of allegations to the effect that the Area Committee had met in "star chamber" session without notifying plaintiff or affording her an opportunity to present evidence in support of her claim, and that the only facts and circumstances which had been brought to the attention of such committee were contained in reports of investigations conducted by defendant's employees, none of which investigations included an interview with plaintiff. From these circumstances plaintiff, in her petition, drew the conclusion "That therefore, this committee and the defendant herein conspired together in closed session to deliberately defraud this plaintiff of her rights and of the Death Benefits due her and thereby perpetrated a fraud on her and acted in the utmost bad faith."

The record contains no evidence of a conspiracy between defendant corporation and the Area Committee which recommended denial of plaintiff's claim. The evidence does, indeed, establish that defendant was given no notice of the meetings, either of the Area Committee or of the General Committee, at which her right to death benefits was considered, and that she, consequently, could not appear and present her claim in person and through witnesses. It is also true that most of the material considered by the Area Committee consisted of reports submitted by defendant's employees, at least some of whom were employed in a supervisory capacity.

The evidence discloses that it was standard procedure[2] for both the Area Committee and the General Committee to meet and consider claims without giving notice to

---

1. See Mora v. Mora, 429 S.W.2d 660 (Tex. Civ.App.—San Antonio 1968, no writ).

2. The plan contained no provisions establishing a procedure to be followed in determining questions concerning claims for

benefits, although it did provide for the adoption of rules and regulations to govern the processing of such claims. No such rules and regulations were ever adopted.

the claimant and without hearing witnesses. Usually, if not always, action was taken based solely on reports submitted by company officials or company investigators. In this case, after the death of plaintiff's husband on June 19, 1964, in San Antonio, defendant's San Antonio District Plant Superintendent, after an interview with decedent's daughter by a prior marriage, reported to the San Antonio Division Plant Personnel Supervisor that plaintiff was not living with her husband at the time of his death. On the basis of this report, a letter, addressed to the Area Committee in Houston, was prepared for signature by defendant's Division Plant Superintendent. This letter contained a recommendation that death benefits not be paid to plaintiff because she and Mr. Long were not living together at the time of his death.

On July 7, 1964, the Area Committee met in Houston and, acting on the basis of the information forwarded from San Antonio, recommended that plaintiff's claim be denied. On August 13, 1964, James W. Dodson, secretary of the Area Committee, received a letter from plaintiff's attorney. In this letter the attorney stated that although plaintiff and her husband maintained separate residences to "some extent," he living in Leon Valley, Texas, while she resided in San Antonio, Mr. Long spent a good deal of time at plaintiff's residence in San Antonio and provided plaintiff with groceries and other necessaries periodically. The letter also stated that both parties had keys to both residences, and that the husband kept many of his personal belongings at plaintiff's San Antonio residence, where he "held all of his family gatherings." The letter pointed out that plaintiff and her husband were attempting to sell the Leon Valley property and that it was necessary for Mr. Long to spend much time in Leon Valley "in order to keep the premises in a habitable condition."

Dodson then asked one of defendant's investigators to conduct a full investigation. On October 13, 1964, the investigator submitted his report, including therein details concerning the marriage and divorce records of the parties; the fact that plaintiff had handled and paid for her husband's funeral; and two credit applications by plaintiff in which she described herself as an unmarried woman prior to the death of her husband. The report also summarized information obtained by the investigator as a result of questioning neighbors and acquaintances of the deceased, as well as the decedent's daughter. Included in such summary was a statement by decedent's son-in-law to the effect that decedent spent the night with plaintiff in San Antonio occasionally, but that plaintiff never went to the Leon Valley residence because "she didn't like the place because it was not fixed up very well." Also included in the report was a copy of an instrument, designated "Contract for Labor and Material and Trust Deed," executed by plaintiff about five months before the date of her husband's death and filed with the County Clerk of Bexar County. In this instrument, plaintiff described herself as a feme sole. This instrument was a contract with a home improvement company for improvements to be made to the San Antonio residence where plaintiff lived and contained recitals obviously intended to give to the improvement company a mechanic's lien on such property.

On October 28, 1964, the Area Committee again considered plaintiff's claim. In accordance with customary procedure, a digest of the case had been distributed to the committee members beforehand. The committee had before it the details of the investigations conducted by defendant's agents as well as the letter from plaintiff's attorney. The Area Committee again recommended that plaintiff's claim be denied. Again, plaintiff had no notice of this meeting.

The Area Committee's recommendation, together with the file relating to plaintiff's claim, was forwarded to the General Committee in St. Louis. In November, 1964,

the members of the General Committee, each of whom had received, one week beforehand, a digest of the case containing the information considered by the Area Committee, voted to deny plaintiff's claim to death benefits. Plaintiff had no notice of this meeting.

Prior to February 12, 1965, plaintiff had retained a new attorney who, on that date, wrote to defendant making a claim for the payment of death benefits to plaintiff. This letter was answered by one of defendant's attorneys who, after pointing out that the claim had been previously presented by another attorney and had been denied after review by the General Committee, informed plaintiff's attorney that if he had any information which he felt might show plaintiff's eligibility for death benefits, representatives of defendant were ready to discuss the matter further. Plaintiff, without making further efforts to communicate with defendant, then filed this suit.

■ Plaintiff does not contend that the General Committee disregarded any evidence which tended to support plaintiff's claim, nor does she claim that the evidence introduced during the trial of this case establishes as a matter of law that she and her deceased husband were, in fact, living together at the time of his death. The members of both committees had information to the effect that, although plaintiff and her husband maintained separate residences, he contributed to her support and, on occasions, spent the night with her in San Antonio, where he kept many of his personal effects. They were advised of plaintiff's contention that the only reason her husband was living in a separate home was for the purpose of keeping it up so that it could be sold. While these facts point strongly, or perhaps, conclusively, to the fact that plaintiff and her husband were in fact "living together," plaintiff's version of the relationship between her and her husband is rendered at least somewhat unpersuasive by the fact that, shortly before his death, she had, in executing the mechanic's lien documents and in applying

for credit, described herself as unmarried. We recognize that a husband and wife may be "living together," even while maintaining separate abodes, if they are living as husband and wife with voluntary recognition of the marital relationship, and with no design to live apart "with the chief end in view that of living apart free from reciprocal marital rights and duties." 41 Am.Jur.2d, Husband and Wife, § 7, p. 206. Where it appears that a husband and wife dwell in separate homes for their own convenience without estrangement or repudiation of the marriage relationship, "it is no strain of logic or credulity to find that they were 'living with' each other." Sheaffer v. Penn Dairies, Inc., 161 Pa.Super. 583, 56 A.2d 368 (1948). However, in this case, the representations made by plaintiff, shortly before her husband's death and while they were living in separate homes, raised a fact issue, at least, concerning her continued recognition of the marital relation.

■ Plaintiff's allegations of conspiracy are without foundation in the evidence. The evidence considered by the Area Committee and the General Committee fairly reflected plaintiff's contentions. After the initial recommendation concerning plaintiff's claim was made by the Area Committee, an assertion of plaintiff's theory of the nature of her relationship with her husband was followed by an investigation, the report of which reflected some facts in support of plaintiff's contention, and a reconsideration of the matter by the Area Committee. After the General Committee had denied plaintiff's claim, the inquiry by her attorney evoked a response indicating a willingness on the part of defendant to discuss the matter further. This offer brought no response from plaintiff other than the institution of this suit. The record, then, discloses no support for the conclusion that defendant was guilty of actual fraud or bad faith.

■ Plaintiff contends that the fraud and bad faith is found in the plan itself

and in the provisions for its administration. As already pointed out, the decisions support the validity of provisions which leave the final determination of eligibility to management or to a committee appointed by management. The fact that plaintiff's case was handled as claims for benefits were usually processed and determined, without giving her an opportunity to appear in person, and without even notifying her that an investigation was being conducted, does not constitute legal fraud. Western Union Telegraph Co. v. Robertson, 146 Ark. 406, 225 S.W. 649 (1920). See also Clark v. New England Tel. & Tel. Co., 229 Mass. 1, 118 N.E. 348 (1918), where it was squarely held that the failure to give notice and to conduct a "hearing" was not evidence of fraud, and that the employer had a right to make his decision on the basis of reports submitted by company employees.

Although the question of fraud or bad faith was not involved in Webster v. Southwestern Bell Tel. Co., 153 S.W.2d 498 (Tex.Civ.App.—El Paso 1941, writ ref'd), it was there held that a plan identical to the one here before us was valid. Interestingly enough, that case also involved a denial of a surviving spouse's claim for death benefits, on the ground that the parties were not living together at the time of the employee's death, and such denial was upheld despite the fact that the jury found, as did the jury here, that the parties were, in fact, living together.

█ Plaintiff's reliance on the collective bargaining agreement between defendant and the bargaining agent of the employees is misplaced. The contract with the union merely restricts the right of defendant to make unilateral changes in the benefits payable under the plan. Such agreement does not, in any way, concern itself with, or even refer to, the manner in which the plan is administered.

The judgment of the trial court is affirmed.