ENNIS BUSINESS FORMS, INC., Appellant,

v.

Leonard F. GEHRIG, Appellee.

No. 5502.

Court of Civil Appeals of Texas, Waco.

Feb. 19, 1976.

Rehearings Denied March 18, 1976.

Jackson, Walker, Winstead, Cantwell & Miller, Ralph E. Hartman, Jack Pew, Jr., Dallas, for appellant.

Burleson, Bondies, Baldwin & Pate, Jack C. Pate, Dallas, for appellee.

HALL, Justice.

The appellant, Ennis Business Forms, Inc., provides a retirement plan for its employees, including disability retirement, which is wholly funded by the company. Leonard F. Gehrig, the appellee, brought this suit against the appellant, and the individual members of the "retirement committee" who administered the plan, challenging a decision by the committee that resulted in termination of payment of disability retirement benefits to him under the plan. The main issues on the trial were whether the committee's decision to end Gehrig's disability benefits was made in bad faith; and whether Gehrig was in fact disabled as that term is defined in the retirement plan. Trial was to a jury which found both bad faith and disability. Upon these findings, judgment was rendered awarding Gehrig a recovery against only the company for (1) disability benefits not paid between the date of their termination and the date of trial, and (2) a sum representing the disability payments Gehrig would purportedly be entitled to receive for the remaining term of the applicable plan provisions. The judgment provided, further, that Gehrig take nothing against the members of the retirement committee. Only the company appeals.

The company's pension plan was adopted on January 1, 1957. Normal retirement under the plan begins for an employee when he attains the age of 65 years, or when he complete 45 years service, whichever is earlier. In other pertinent parts the plan provides as follows:

2.4—*DISABILITY RETIREMENT AND RETIREMENT INCOME.*

(A) *Definition*: A participant may retire from the service of the company under the plan if he becomes totally and permanently disabled, as defined in Paragraph (B) of this Section 2.4, on or after the effective date of the plan but prior to his normal retirement date. Such retirement from the service of the company shall herein be referred to as disability retirement.

(B) *Total And Permanent Disability*: A participant will be considered totally disabled if, in the opinion of the retirement committee, he is disabled, due to sickness or injury, and such disability, in the opinion of the retirement committee, is likely to be continuous and permanent . . . such that the participant is completely unable to perform any and every duty pertaining to his occupation; provided, however, after such disability has continued for a period of 30 months from its date of commencement, as determined by the retirement committee, such participant shall, for the purposes of this plan, be considered fully recovered from such disability unless at that time, due to such disability, such participant is unable to engage in any reasonable occupation, where "reasonable occupation" means any occupation which other individuals who have an educational background similar to that of the participant, and are in good health, are actually engaged in as their principal means of financial support; and further provided, that at the end of a 66-month period commencing

with such date of commencement of disability such participant shall be considered fully recovered for purposes of this plan unless at that time, due to such disability, he is wholly prevented from engaging in any occupation for wage or profit. Any opinion of the retirement committee rendered in accordance with the provisions of this section shall be final and conclusive and shall not be subject to review by anyone.

.   .   .   .   .

(D) *Proof Of Disability*: The retirement committee before approving the payment of any disability retirement income shall require satisfactory proof, in the form of a certificate from a duly licensed physician selected by the retirement committee, that the participant has become disabled as provided herein. Every six months after commencement of disability retirement income, or more frequently, the retirement committee may similarly require proof of the continued disability of the participant.

.   .   .   .   .

(F) *Recovery From Disability*: If the retirement committee finds that the participant who is receiving disability retirement income is, at any time prior to his normal retirement date, no longer disabled, as provided herein, the retirement committee shall direct that the retirement income be discontinued  .   .   .

5.4—*RULES AND REGULATIONS OF RETIREMENT COMMITTEE.*

The retirement committee shall have the authority to make such rules and regulations, and to take such actions as may be necessary to carry out the provisions of the plan, and will, subject to the provisions of the plan, decide any questions arising in the administration, interpretation and application of the plan— which decisions shall be conclusive and binding on all parties. The retirement committee may delegate so much of its authority and duties as it deems expedient.

5.5—*POWERS OF RETIREMENT COMMITTEE.*

In order to effectuate the purposes of the plan, the retirement committee shall have the power to construe the plan, to supply any omissions therein, to reconcile and correct any errors or inconsistencies, and to make equitable adjustments for any mistakes or errors made in the administration of the plan, and all such action or determinations made by the retirement committee in good faith shall not be subject to review by anyone.

5.8—*APPLICABLE LAW.*

The plan will be construed and enforced according to the laws of the State of Texas, and all provisions of the plan will be administered according to the laws of the said State.

Answering special issue no. 1, the jury found that the retirement committee acted in bad faith when it terminated Gehrig's disability retirement benefits on June 17, 1974. In connection with this issue, the jury was instructed that the term "bad faith" meant "that the person doing the act must have had knowledge of such substantial facts and circumstances as to create in his mind a suspicion that there was something wrong and in spite of such suspicion, intentionally disregards and refuses to learn the facts from the means of knowledge which he knows are at hand."

In its answers to special issues nos. 2, 3, 4, and 5, the jury found that Gehrig became totally and permanently disabled beginning March 1, 1974. The jury was instructed that "total disability" meant "that a person is unable to engage in any reasonable occupation which other individuals who have an educational background similar to that of the person, and are in good health, are actually engaged in as their principal means of financial support"; and that the term "permanent" meant that a person is "continuously, wholly and permanently prevented from engaging in any occupation for wage or profit." Although these defini-

tions are not in question, it should be noted that they were taken directly from the retirement plan.

The company objected to the court's definition of bad faith on the ground that it was taken from the law of negotiable instruments and, for that reason is inappropriate to this suit. It tendered this definition and requested instruction to the jury: "By the term 'bad faith' is meant dishonestly, with fraud, collusion or deceit." The objection and requested instruction were overruled and refused. The company's assignments of error to these rulings are overruled.

■ To preserve error relating to a definition contained in the court's charge, it was incumbent on the company to object to the definition, "point out distinctly the matter to which [it] objects and the grounds of [its] objection." Rules 272 and 274, Vernon's Tex.Rules Civ.Proc. The source of a definition submitted to a jury is of no consequence if the definition is not otherwise objectionable under the record, and the company's objection on this ground does not meet the quality of specificity required by the Rules.

■ Moreover, within the context of this case, the company's tendered definition of "bad faith" is too restrictive. Under the express terms of § 5.5 of the plan, and the law of this State as expressed in *Neuhoff Brothers Packers Management Corp. v. Wilson*, (Tex.Sup., 1970) 453 S.W.2d 472, the retirement committee is tied to a good faith standard of conduct in the performance of its duties. As used here in relation to a decision-making process critical to the welfare of the employees for whom the plan is funded by the company, and to the company-employee relationship, the term "good faith" necessarily means more than the legalistic level of honesty required by the appellant's tendered definition, and prohibits also arbitrary and capricious activity by the committee. In other words, the requirement in the plan of good faith activity by the retirement committee is obviously

designed to prevent arbitrary decisions as well as those patently dishonest. *See Bruner v. Mercantile National Bank*, (Tex.Civ. App.—Dallas, 1970, writ ref., n. r. e.) 455 S.W.2d 323, 327; *McHorse v. Portland General Electric Company*, (1974) 268 Or. 323, 521 P.2d 315, 319; *Marsh v. Greyhound Lines, Inc.*, (5th Cir.Ct.App., 1974) 488 F.2d 278, 280; *Hainline v. General Motors Corporation*, (6th Cir.Ct.App., 1971) 444 F.2d 1250, 1257. The company's definition was properly refused.

The company asserts that the evidence is legally and factually insufficient to support the jury's finding of bad faith by the committee, even under the definition submitted to the jury. We are bound to review this complaint, and others like it, under the rules set forth in *In re King's Estate*, 150 Tex. 662, 244 S.W.2d 660, 661 (1951). It must be noted, however, that because the definition of "bad faith" submitted to the jury was not properly challenged on the trial, our resolutions of the questions of sufficiency of proof to support the finding of bad faith must be based upon that definition. This definition is made up of these two elements: At the time the retirement committee terminated Gehrig's disability retirement benefits, (1) did it "have knowledge of such substantial facts and circumstances as to create a suspicion" that (in accordance with the provisions of § 2.4(B) of the plan) Gehrig was disabled to the extent that he was "unable to engage in any occupation which other individuals who have an educational background similar to [his], and are in good health, are actually engaged in as their principal means of financial support"; and, if it did, then (2) did it also, "in spite of such suspicion, intentionally disregard and refuse to learn the facts from the means of knowledge which it knew were at hand"? We believe the phrase "intentionally disregard and refuse to learn the facts" was used by the court in this definition to denote a conscious indifference on the part of the committee; and not to mean willful wrongdoing such as a dishonest, deceitful, or fraudulent act.

Without detailing it, there is evidence in the record which, with inferences raised by it, shows that Gehrig began his employment with the company in 1940; that he became its president in 1969, and chief executive officer soon thereafter; that the company is a broadly diversified corporation with subsidiaries and offices nation-wide; that during Gehrig's leadership, the company suffered several set-backs, and he, in turn, suffered a mental and emotional break-down—a "burning out" which is not an uncommon result of the stress and tensions placed upon the top leadership of large corporations—which is progressive; that in 1971, the company's board of directors determined to, and did, relieve Gehrig of his duties and effectively forced him to "resign" from the company's employment and his position on the board of directors on August 31, 1971, albeit with generous sums of "termination pay," which included six-months' salary, unearned director's fees, and disability retirement benefits under the plan in question; that, at the time these benefits were granted, the new leadership of the company, which serves upon and dominates the retirement committee, did not intend that the benefits should exceed a 30-month period ending March 1, 1974, regardless of Gehrig's condition at that time; that Gehrig has continued to deteriorate mentally and emotionally, and is not now capable of holding a job; that the committee's termination of the disability benefits was based on the fact that Gehrig is *physically* well, although the members knew at the time of their decision, or at the least had knowledge of facts which should have created a reasonable belief in their minds, that Gehrig was mentally disabled from functioning on the plane of other employees of his educational level; and that, with the means available, the committee members simply were not interested in determining Gehrig's true mental state or its bearing upon his disability.

These circumstances are legally sufficient to support the jury's determination that the committee acted in bad faith, *as that term is defined in the court's charge.* A review of the entire record convinces us that the evidence is factually sufficient to support the finding.

Although not questioning the findings that Gehrig is totally and permanently disabled, the company contends that the evidence is legally and factually insufficient to support the findings that the total and permanent disability began on March 1, 1974. Again without detailing it, it is our view of the evidence that it is legally and factually sufficient to support determinations, if made, that Gehrig was totally and permanently disabled, as those terms are defined in the charge, at the time he left the company in August, 1971, and that his mental condition progressively worsened from then to the time of trial in 1975. These facts circumstantially support the jury's selection of March 1, 1974, as the beginning date.

As we have said, Gehrig resigned on August 31, 1971. His monthly disability payments under the plan were determined by the actuary to be $1,812.10 per month. He will be eligible for normal retirement benefits under the company's pension plan beginning October 1, 1977, following his 65th birthday on September 12th, with monthly benefits of $2,261.33.

The case was submitted to the jury on the theory that if the retirement committee's ending of Gehrig's benefits was found to have been done in bad faith, then this constituted an anticipatory breach of the pension plan contract and matured Gehrig's right to all future benefits thereunder. Answering special issues, the jury made a number of findings related to sums of money Gehrig was purportedly entitled to receive as disability benefits up to October 1, 1977, and for regular retirement benefits after October 1, 1977. The trial court disregarded these findings and, on May 28, 1975, rendered judgment awarding Gehrig (1) $19,933.10, representing "the amount due and owing for past disability payments from July 1, 1974, through [the time of judgment in] May, 1975"; and (2) $37,-603.58, representing "the present value of

that sum of money" necessary to fund monthly disability retirement benefits of $1,812.10 from June 1, 1975 to March 1, 1977, which Gehrig "would be entitled to receive . . . but for the bad faith action of the Retirement Committee on June 17, 1974." While challenging Gehrig's right to any recovery, the company asserts that, in any event, the principles of anticipatory breach do not bear application in this case and Gehrig is therefore not entitled to recover future benefits in this lawsuit.

Although the plan in question is funded wholly by the company, benefits payable thereunder are in no sense "gifts" by the company. Rather, the plan is a contract between the company and its employees, based upon valuable considerations. *Lee v. Lee*, 112 Tex. 392, 247 S.W. 828, 833 (1923). It may be that the doctrine of anticipatory breach has application to a contract of this nature in a proper case. But we agree with the company that Gehrig's reliance upon the doctrine in this case is misplaced. Assuming, as we must under the record, bad faith activity by the retirement committee relating to Gehrig's right to disability benefits, there is no evidence that the company or the retirement committee intended to disavow the fact that Gehrig is a participant under the plan, or that it intends to deny him future benefits under it such as early retirement benefits or regular retirement benefits. In fact, undisputed evidence shows that the retirement committee tendered early retirement benefits under the plan to Gehrig when his disability benefits were terminated. In short, the record does not show an intention on the part of the company, through the committee or anyone, to repudiate the plan and to not comply with its terms in the future.

The doctrine of anticipatory breach is applicable only where there is an unequivocal renunciation of the contract by the defaulting party. *Universal Life & Accident Ins. Co. v. Sanders*, 129 Tex. 344, 102 S.W.2d 405, 406 (Tex.Com.App., opinion adopted, 1937); *Pollack v. Pollack*, 39 S.W.2d 853, 855, (Tex.Com.App., holdings approved, 1932); *Ulen Securities Co. v. City of El Paso*, 59 S.W.2d 198, 199 (Tex.Civ. App.—El Paso, 1933, writ ref.). The party not in default will be justified in treating the contract as repudiated or abandoned only where the other party to the agreement, by his conduct or misconduct, clearly shows a fixed intention during nonperformance to repudiate the agreement and not to comply with its terms in the future. *Kilgore v. Northwest Texas Baptist Educational Ass'n*, 90 Tex. 139, 37 S.W. 598 (1896); *Burks v. Neutzler*, 2 S.W.2d 416, 418 (Tex. Com.App., 1928); 13 Tex.Jur.2d 566, Contracts, § 310. Accordingly, it is the rule that refusal by one party to perform an independent provision of a divisible contract is not such renunciation or abandonment as will support an action under the principles of anticipatory breach of the whole agreement. *Surko v. Harrison*, 391 S.W.2d 115, 119 (Tex.Civ.App.—Corpus Christi, 1965, writ ref'd n. r. e.); *Leonard v. Kendall*, 190 S.W. 786, 788–789 (Tex.Civ.App.—Dallas, 1917, writ ref'd).

There is an additional reason why Gehrig may not now recover future disability benefits. The retirement committee is expressly authorized by the terms of § 2.4(D) of the plan, supra, to require proof every six months, or more frequently at its discretion, of the continued eligibility of a recipient of disability pension benefits, and is required by § 2.4(F) thereof to end the benefits if the participant is no longer disabled. Gehrig's argument that a holding that he is not entitled to now mature future benefits will "force him into court every few weeks to collect a monthly payment" is not persuasive. Although the record does support a finding of conscious indifference by the committee toward Gehrig's past rights under the plan, it does not show a willful disregard of those rights by the committee members, nor does it indicate that they do not intend a good faith attitude toward those rights in the future in keeping with our rulings in this case.

Gehrig was, nevertheless, entitled under the record to the award of disability benefits from the time they were terminated through the date of judgment. The record shows without dispute that the benefits were paid through June, 1974; that judgment was rendered on May 28, 1975; and that the disability benefits are $1,812.10 per month. This portion of the judgment, totaling $19,933.10, is affirmed.

Under the terms of the plan, a trust fund is created and maintained for the purposes of the plan. Express provision is made in the plan that any person having a claim for benefits must "look solely to the assets of the trust fund for satisfaction"; and that "in no event" will the company, its employees or officers or agents be liable for such benefits. The company cites these provisions and asserts that the judgment against it cannot stand, and that any judgment in the case must be against the fund. We disagree.

As we have said, all contributions to the plan are made by the company; none are made by the employees. All contributions are irrevocable and are transferred to the trust fund. The fund is invested and administered by a trustee appointed by the company in accordance with a trust agreement between the company and the trustee which, under the terms of the plan, is made a part of the plan. The administration and responsibility for carrying out the plan is in the hands of the retirement committee consisting of five persons appointed by the company's directors to serve at the director's pleasure. Employees' qualifications for benefits are determined by the committee. Qualified employees are limited to the retirement benefits determined by formulas set forth in the plan. For these calculations, the committee has available to it actuarial service selected by the board of directors. The plan vests the committee with rule-making power for the administration of the plan and for the transaction of its business, subject to the plan's limitations, as well as certain restrictions, requirements or modifications the directors may from time to time impose. When the committee, acting within these boundaries, determines a question in connection with the plan, such determination, unless shown not to have been made in good faith, is deemed conclusive and binding on all persons having an interest in the plan.

The trust agreement between the company and its designated trustee is not in evidence. According to exhibits in the record, however, the trustee pays benefits, and ceases paying, on direction from the retirement committee.

The judgment in question clearly states that the amounts awarded therein to Gehrig are for disability retirement benefits under the plan. In view of the immediate control over the administration of the plan (including the disbursement or not of benefits thereunder) by the company's board of directors through the retirement committee, and especially in the absence of the terms of the trust agreement which forms a part of the plan, we cannot say that the trustee is an indispensable party or that the judgment is improper because it is solely against the company and not against the trust fund. See, *Murphy v. R. J. Reynolds Tobacco Company*, 260 Iowa 422, 148 N.W.2d 400 (1967), and cases cited therein.

The appellant has other points and contentions. Some are rendered immaterial by our rulings. The others do not present reversible error.

The judgment is reformed to delete therefrom the award of $37,603.58 for future benefits. As reformed, the judgment is affirmed.

Trial court costs are assessed against the appellant. The costs of this appeal are assessed one-half against the appellant and one-half against the appellee.